```
                                              ┌─────────────────────────────────┐
                                              │ USDS SDNY                        │
                                              │ DOCUMENT                         │
                                              │ ELECTRONICALLY FILED             │
                                              │ DOC #: _____          │
                                              │ DATE FILED: 10-9-13              │
                                              └─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
MIRIAM MARQUEZ,

                Plaintiff,                      12 Civ. 6819 (PKC)

          -against-                   MEMORANDUM
                                           AND ORDER

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF SOCIAL
SECURITY,[1]

                Defendant.
-----------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

        Plaintiff Miriam Marquez seeks judicial review under 42 U.S.C. § 405(g) of a final decision of the Commissioner of Social Security (the "Commissioner") that she is not eligible for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 et seq., or Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq., because she is not disabled within the meaning of the Act. Plaintiff asserts that the decision of the Administrative Law Judge ("ALJ") was erroneous, not supported by substantial evidence, and contrary to law.

        Plaintiff and defendant have each moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, the defendant's motion is granted and the plaintiff's motion is denied.

---

[1] Carolyn W. Colvin, who became the Acting Commissioner of Social Security on February 14, 2013, has been automatically substituted for Michael J. Astrue as the defendant in this action pursuant to Fed. R. Civ. P. 25(d).

## I.   PROCEDURAL HISTORY

Plaintiff applied to the Social Security Administration ("SSA") for DIB and SSI on June 2, 2008 and June 13, 2008, respectively, alleging a psychological disability that began on December 30, 2004. (R. 135-42)[2] Specifically, plaintiff claimed that depression and anxiety limited her ability to work. (R. 163) SSA denied her claims on September 25, 2008. (R. 64-70, 72-78) Plaintiff timely requested a de novo hearing before an ALJ, which was held on July 9, 2010. (R. 31, 81) Plaintiff appeared at the hearing and was represented by counsel. (R. 31) At the hearing, plaintiff amended her alleged onset date to April 27, 2006. (R. 36-37) Plaintiff also testified that she suffered from a second impairment, arthritis, based on ongoing treatment with Dr. Leonid Bukhman. (R. 35)

In a written decision dated September 15, 2010, ALJ Mark Solomon denied plaintiff's claim for benefits. (R. 17-26) Applying the agency's sequential five-step test for determining whether an individual is disabled, ALJ Solomon concluded that plaintiff is not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. (R. 26) Based on the evidentiary record, he concluded that although plaintiff had several severe impairments, including panic disorder with agoraphobia, generalized osteoarthritis, and asthma, she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 19) The ALJ further concluded that plaintiff still had the residual functional capacity ("RFC") to perform light work defined in 20 CFR 404.1567(b) with certain limitations; he stated that she could handle simple, low stress work with limited interpersonal contact. (R. 20-21) With respect to the

---

[2] Citations to "(R. ___)" refer to the certified copy of the administrative record of proceedings filed by the Commissioner as part of his answer. (Docket No. 6)

credibility of plaintiff's allegations, he found that "[plaintiff's] medically determinable

impairments could reasonably be expected to cause the alleged symptoms; however, the

claimant's statements concerning the intensity, persistence, and limiting effects of these

symptoms are not credible to the extent they are inconsistent with the above residual functional

capacity assessment." (R. 24)

On October 10, 2010, plaintiff requested, through her attorney, review of the

ALJ's decision. (R. 11-12) The SSA Appeals Council denied the request for review on July 18,

2012, and ALJ Solomon's decision thus became the final decision of the Commissioner. (R. 1)

This case was then ripe for judicial review.

Plaintiff filed a timely action in this Court seeking review of the Commissioner's

final decision. Both parties moved for judgment on the pleadings pursuant to Rule 12(c), Fed. R.

Civ. P.


## II.  EVIDENCE BEFORE THE ALJ

At the hearing before ALJ Solomon, plaintiff testified about her age, education, family,

daily activities, work history, medical treatment history, and physical and psychiatric condition.

(R. 38-51) The ALJ also heard testimony from Raymond Cestar, a vocational expert witness,

regarding plaintiff's suitability for her past work or for other work in the national economy.  The

ALJ also reviewed documentary evidence, including a pre-onset medical report from Arbor

WeCare (R. 235-43); records from Metropolitan Health Center ("MHC"), where plaintiff was

treated by at least a dozen different providers over a four-year period (R. 244-71, 312-13, 351-

54, 358-67, 383-470); a report from Dr. Haruyo Fujiwaki, a consulting psychologist (R. 282-85);

a report from Dr. Jerome Caiati, a consulting internal medicine physician (R. 278-81); a report

from the Federal Employment and Guidance Service (R.314-50) ; and medical records from Dr. Leonid Bukhman, a family practitioner (R. 368-82).

a. Plaintiff's Background and Hearing Testimony

Plaintiff was born on October 5, 1964. (R. 38)  At the time of her hearing testimony, she lived in apartment with her eighteen-year-old daughter. (R. 46)  She has earned a GED. (R. 38)  She speaks English and Spanish. (R. 236)  She is able to use public transportation, to take care of her personal needs around the house, to shop for groceries across the street, and to lift the weight equivalent of two gallons of milk. (R. 46-49)

For approximately five years ending in December 2004, plaintiff worked full-time as a receptionist.  She testified that she was laid off on account of a combination of her inability to finish tasks and business being slow. (R. 39)  As the ALJ noted both at the hearing and in his subsequent decision, in an August 31, 2005 "Biopsychosocial Report" prepared by a clinic to which plaintiff was referred for job counseling, plaintiff reported that she was laid off because company business was slow, and made no mention of any medical problems or conditions. (R. 22, 39, 239)

Plaintiff testified to suffering from arthritis in her legs, feet, hands, and spine; she explained that she was treated with pain medication for this condition. (R. 41-42)  She also reported swelling in her legs and feet that worsens as she walks. (R. 41, 48)  She was provided with a cane but does not use it and is able to walk without it. (R. 48)  She testified to being able to sit without any problems for about 45 minutes, after which she experiences stiffness in her feet. Id.  Plaintiff further testified to suffering from panic attacks since 2004, triggered by stressful situations. (R. 44-45)  She clarified that she suffers from panic attacks more often when

she is outside of her home, as she is uncomfortable being around other people. (R. 45)  She explained that during such attacks, which generally last up to one or two hours, her hands tremble, her heartbeat is elevated, and she feels nauseous.  Id.

    b.  Medical Records

      i.  Psychological Impairments

In August 2005, plaintiff was evaluated at Arbor WeCare, a "wellness, comprehensive assessment, rehabilitation and employment program." (R. 236)  She was referred to the program for job counseling, apparently at the direction of a public assistance agency. (R. 40, 236)  The resulting "Biopsychosocial Report" diagnosed plaintiff with generalized anxiety disorder, an upper respiratory infection, and asthma. (R. 241)

On April 27, 2006, plaintiff was first seen at MHC for an initial psychological evaluation. (R. 423-25, 430, 458-59)  This would be plaintiff's first of at least 26 visits to MHC documented in the evidentiary record.  Plaintiff was diagnosed with "anxiety disorder NOS" (not otherwise specified) and asthma, and scheduled for a return visit. (R. 425)  She met with several clinical social workers and Dr. Raihana Khorasanee for therapy sessions and medication refills eight times over the following ten months. (R. 431-37, 460-61)  During this period, plaintiff's case was closed on several occasions due to missed appointments, lack of follow-up, and non-compliance. (R. 432, 437, 460-61).

On July 2, 2007, plaintiff returned to MHC seeking to resume mental health treatment. (R. 406-07)  MHC conducted a new initial evaluation of plaintiff, and Dr. Leon Bernhardt provided a primary diagnostic impression of panic disorder with agoraphobia. (R. 398)  At a follow-up appointment, plaintiff's therapist ruled out panic disorder with agoraphobia. (R. 399)  Plaintiff's case was closed once more on October 10, 2007.  Id.

On March 5, 2008, plaintiff resumed mental health treatment at MHC, where her therapist again diagnosed her with panic disorder with agoraphobia, renewed her prescriptions, and scheduled a return visit in two months. (R. 400) Plaintiff returned to MHC once in May and once in July; on both occasions, the diagnosis of panic disorder with agoraphobia was reiterated. (R. 400-01) At her next two visits to MHC in November 2008, plaintiff's therapists noted that she became anxious in crowded places. (R. 404)

At the behest of the SSA, plaintiff was examined by Dr. Haruyo Fujiwaki, a consulting psychologist, on August 12, 2008. (R. 282-85) Dr. Fujiwaki noted that plaintiff was able to take public transportation alone. (R. 284) He further opined that she could follow and understand simple directions, perform simple tasks independently, learn new tasks with extended time, and perform complex tasks with supervision, but that she may have difficulty relating with others and dealing with stress appropriately. Id. He diagnosed anxiety disorder NOS, depressive disorder NOS, alcohol dependence in remission, and asthma. (R. 285)

From December 23, 2008 through February 2009, plaintiff was evaluated by the Federal Employment and Guidance Service ("FEGS"). (Tr. 320-21) The final diagnosis from FEGS was panic disorder with agoraphobia and obsessive compulsive disorder, with bipolar disorder ruled out. (R. 342) The report found her "temporarily disabled from work;" with treatment, it projected that she could return to full-time work within six months. Id. The FEGS report also noted that plaintiff might require a travel accommodation because she "cannot travel in crowded buses or trains because of panic attacks." Id. The report incorporated a two-page "Treating Physician's Wellness Plan Report" filled out by Dr. Abdul Mohit at MHC, who checked a box indicating that, based on an examination, plaintiff was limited by anxiety, panic

attacks, depression, and mood swings, and would be unable to work for at least 12 months. (R. 318)

Plaintiff subsequently returned to MHC on July 27, 2009, and her attending examiner diagnosed her with anxiety disorder. (R. 405) She was next treated at MHC on September 24, 2009 and February 1, 2010, but her treatment notes from these visits are largely illegible. (R. 402) At a return visit on April 1, 2010, she was evaluated by Drs. Scott Schwartz and Mohamed Ndiaye. (R. 394-95) In their progress notes, the doctors noted that plaintiff expressed no complaint, reported no side effects from her medications, and was cooperative, stable, alert, and oriented. (R. 394) Their report diagnosed anxiety disorder NOS based on her treatment history and recommended a continuation of supportive therapy. (R. 395)

On June 7, 2010, plaintiff was treated for the first time by Dr. Faith Aimua. (R. 391) Dr. Aimua's notes indicated that plaintiff came for a medication refill and to have paperwork filed for her SSI application. Id. Plaintiff's appointment lasted 20 minutes. Id. She reported persistent anxiety symptoms but denied any depressive disorder or psychotic symptoms. Id. Dr. Aimua diagnosed plaintiff with agoraphobia with panic disorder and recommended a return visit two months later. Id.

Three days later, Drs. Aimua and David Goodman completed a "Psychiatric/ Psychological Impairment Questionnaire" ("Questionnaire"). (R. 360-67) There is no evidence that Dr. Goodman actually examined plaintiff, though his stamp is on the Questionnaire. (R. 23, 367, 391) This eight-page form was presumably the paperwork referred to in Dr. Aimua's notes from the previous appointment, as its language tracks terminology found in SSA regulations. Dr Aimua indicated that plaintiff began treatment on April 27, 2006 and was examined monthly. (R. 360) Her diagnosis was panic disorder with agoraphobia, with a tertiary diagnosis of asthma.

7

Id. To provide "positive clinical findings" in support of the diagnosis, Dr. Aimua checked boxes

indicating that plaintiff suffered from poor memory, social withdrawal or isolation, recurrent

panic attacks, paranoia or inappropriate suspiciousness, generalized persistent anxiety, and

difficulty thinking or concentrating. (R. 361) In a four-category, twenty-item list tracking the

four groups of mental limitations recognized under SSA regulations, Dr. Aimua indicated that

plaintiff was moderately limited in understanding and memory and sustained concentration and

persistence, with marked limitations in social interactions and adaptations. (R. 363-66) She

indicated an expectation that plaintiff's impairments would likely last at least twelve months. (R.

366) Dr. Aimua also indicated that plaintiff was incapable of tolerating even a low level of

"work stress," and that as a result of her impairments she would be likely to be absent from work

more than three times per month. (R. 366-67) Dr. Aimua further provided that the basis for her

conclusion on plaintiff's capacity to tolerate work stress was that "[plaintiff] cannot go out

because of her anxiety of getting panic attacks." (R. 366)

        At her August 4 follow-up MHC appointment, plaintiff saw Dr. Aimua and

reported a bad episode of panic attacks following an incident in which a neighbor threatened her

daughter. (R. 388) Dr. Aimua encouraged plaintiff to file a police report and inform building

management of the incident. Id. Dr. Aimua reiterated her diagnosis of agoraphobia with panic

disorder. Id.

### ii.  Physical Impairments

        On April 29, 2007, plaintiff went to the MHC emergency room for complaints of

bilateral leg and foot pain and swelling. (R. 247-50) She was discharged with a diagnosis of

"pain in limb" and provided with Tylenol. (R. 253) Five days later, she returned to MHC for

treatment of foot stiffness and swelling, left hand numbness, and lower back pain. (R.245-46)

8

The attending physician's primary diagnosis was asthma, with a secondary diagnosis of lumbago and foot arthritis; anti-inflammatory drugs were prescribed. (R. 245)

On June 29 and 30, 2007, plaintiff was treated at MHC for complaints of vaginal bleeding and a headache. (R. 262-67) The attending physician's assessment noted mild to moderate distress, and that plaintiff was "independent with activities of daily living." (R. 255) Plaintiff was diagnosed with metrorrhagia and given Motrin. (R. 258-59)

On June 1, 2008, plaintiff returned to MHC with complaints of asthma, a cough, and a cold. (R. 262-67) She was treated with a nebulizer, diagnosed with asthma and prescribed several oral inhalation medications. (R. 267)

Upon referral by the SSA, plaintiff was evaluated by Dr. Jerome Caiati, M.D., a consulting internal medicine physician on August 12, 2008. (R. 278) Plaintiff complained of asthma since childhood and, since 2008, stiffness of the hands and feet and edema of the legs. Id. She reported that she was able to cook, clean, do laundry, go shopping, attend to personal hygiene, and take care of children. (R. 279) Dr. Caiati reported that plaintiff could walk without difficulty and without the use of assistive devices, could perform a full squat while holding onto a table, needed no assistance during the examination, and was able to rise from a chair without difficulty. Id. A detailed musculoskeletal examination reported no significant limitations in plaintiff's range of motion. (R. 280) Her fine motor activity was reported intact, her grip strength was rated 5/5, and she was found able to write and perform ordinary tasks using her hands. Id. Plaintiff was diagnosed with obesity, depression with a history of alcohol abuse, a history of edema of the legs of unknown origin that was not evident on physical examination, and a history of stiffness of the hands and feet of unknown origin. Dr. Caiati further reported

9

that plaintiff's sitting, standing, walking, reaching, pushing, pulling, climbing, bending, and lifting were unrestricted. (R. 281)

On May 29, 2009, plaintiff sought treatment with Dr. Leonid Bukhman, a family practitioner, for a complaint of worsening asthma. (R. 373-74) An examination of plaintiff's lungs revealed bilateral wheezing, but no rhonci or crackles. (R. 374) Plaintiff was diagnosed with chronic obstructive pulmonary disease ("COPD"), asthma with acute exacerbation, bronchitis, and lower back pain. Id.

On June 11, 2009, plaintiff returned to Dr. Bukhman with complaints of worsening asthma, a sore throat, and pain swallowing. (R. 370) A musculoskeletal examination found a normal range of motion for all joints, with no swelling or deformity and no evidence of scoliosis. (R. 371) A respiratory examination was positive for a cough and negative for asthma and breathing problems. Id. Plaintiff was diagnosed with tonsillitis, COPD, asthma with acute exacerbation, lower back pain, and an unspecified migraine. (R. 372)

Plaintiff next saw Dr. Bukhman on August 23, 2009, complaining of swelling in both knees, joint pain, and fatigue. (R. 375) A musculoskeletal examination was positive for joint pain and swelling, morning stiffness, and muscle pain. (R. 376) Her lungs were reported clear with no wheezes, rhonci, or rales. (R. 377) Dr. Bukhman's diagnosis included COPD, generalized osteoarthritis, asthma with acute exacerbation, and hypertension. Id.

    c.  Vocational Expert Testimony

Raymond Cestar testified as a vocational expert at the hearing after reviewing the record and hearing testimony. (R. 52) The ALJ asked him to assume the RFC set forth by the SSA's assessment: that plaintiff can do light work subject to certain physical limitations and

limited to low-stress, simple jobs with limited interpersonal contact. (R. 53) Mr. Cestar testified that, based on these assumptions, plaintiff would not be able to perform her past work as a receptionist. Id. Mr. Cestar further testified that there were several "light" and "unskilled" jobs that plaintiff could perform that were available in the local and national economies. (R. 54) Specifically, these included positions as a cafeteria attendant, a mail clerk, and a photocopying machine operator. Id. When the ALJ added the additional limitation of "sedentary" work to his RFC hypothetical, Mr. Cestar testified that plaintiff was qualified for locally and nationally available positions as a clerical worker, an account clerk, and an order clerk. (R. 55)

The ALJ noted that plaintiff's treating psychiatrist indicated that plaintiff had "marked limitations" and would be incapable of even low-stress jobs. (R. 55) Asked whether, accepting the opinion of the treating psychiatrist, there are any jobs in the national economy that plaintiff would be able to do, Mr. Cestar responded in the negative. (R. 55-56)

## III. APPLICABLE LAW

### a. Standard Of Review

Under Rule 12(c), Fed. R. Civ. P., a movant is entitled to judgment on the pleadings only if he or she establishes that, based on the pleadings, he or she is entitled to judgment as a matter of law. Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995). "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988).

District court review of the Commissioner's final decision denying disability benefits is limited. A court may not review the Commissioner's decision de novo. See Cage v. Comm'r of Soc. Servs., 692 F.3d 118, 122 (2d Cir. 2012) (citation omitted). If the Commissioner's findings are free of legal error and supported by substantial evidence, the court must uphold the decision. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied . . . the court shall review only the question of conformity with [the] regulations . . . ."); see Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008). A court's review thus involves two levels of inquiry. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). First, the court must review "whether the Commissioner applied the correct legal standard," id., including adherence to applicable regulations, see Kohler, 546 F.3d at 265. Second, the court must decide whether the Commissioner's decision is supported by substantial evidence. Tejada, 167 F.3d at 773.

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation and quotation marks omitted). The substantial evidence test applies to inferences drawn from basic evidentiary facts, as a reviewing court "is required to examine the entire record, including. . . evidence from which conflicting inferences can be drawn." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002). The reviewing court views the evidence as a whole rather than considering evidence in isolation. See Alston v. Sullivan, 904 F.2d 122, 126

12

(2d Cir. 1990). Even if there is substantial evidence weighing against the Commissioner's position, the Commissioner's determination will not be disturbed so long as substantial evidence also supports it. See DeChirico v. Callahan, 134 F.3d 1177, 1182 (2d Cir. 1998) (upholding the Commissioner's decision where there was substantial evidence for both sides).

It is the function of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including claimant." Carroll v. Sec'y of Health and Human Services, 705 F.2d 638, 642 (2d Cir.1983). "[G]enuine conflicts in the medical evidence are for the Commissioner to resolve." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (citation omitted). In particular, courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while testifying. Yellow Freight Sys. Inc. v. Reich, 38 F.3d 76, 81 (2d Cir. 1994); see also Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).

Finally, "[b]ecause a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record," regardless of whether the claimant is represented by counsel. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). The Court must be satisfied that the claimant received a full hearing "in accordance with the beneficent purposes of the Act." Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) To this end, "the reviewing court must make a 'searching investigation' of the record to ensure that" the ALJ protected the claimant's rights. Robinson v. Sec'y of Health and Human Servs., 733 F.2d 255, 258 (2d Cir. 1984) (citation omitted).

b. Five-Step Disability Determination

The Act defines "disability" in relevant part as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

13

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also 42 U.S.C. § 1382c(a)(3)(A).  The Act provides that "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); see also 42 U.S.C. § 1382c(a)(3)(B).  Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A); see also 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner's determination of a claimant's disability follows a five-step sequential analysis promulgated by the Social Security Administration (the "SSA"). 20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit has summarized this analysis as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform

his past work, the [Commissioner] then determines whether there
is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (citation and quotation marks omitted; brackets

and omission in original).  The claimant bears the burden of proof for the first four steps; the

burden shifts to the Commissioner at the fifth step.  See Selian v. Astrue, 708 F.3d 409, 418 (2d

Cir. 2013).

    "In making his determination by this process, the Commissioner must consider

four factors: (1) the objective medical facts; (2) diagnoses or medical opinions based on such

facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4)

the claimant's educational background, age, and work experience."  Brown v. Apfel, 174 F.3d

59, 62 (2d Cir. 1999) (per curiam) (citation and quotation marks omitted).  Further, the

Commissioner "shall consider the combined effect of all the individual's impairments . . . ."  42

U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

    c.   Treating-Physician Rule

    Under applicable regulations, the opinion of a claimant's treating physician

regarding "the nature and severity of [claimant's] impairment[s]" will be given "controlling

weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in [the] case record."  20

C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir.

2003) (citations omitted).  In contrast, a treating physician's opinion is not afforded to

controlling weight when the opinion is inconsistent with other substantial evidence in the record,

such as the opinions of other medical experts. 20 C.F.R. § 404.1527(d)(2); Snell v. Apfel, 177

F.3d 128, 133 (2d Cir. 1999).  In such a case, a report from a consultative physician may

constitute substantial evidence. <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1039 (2d Cir. 1983). If the ALJ gives the treating physician's opinion less than controlling weight, he must provide good reasons for doing so. <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998).

If not afforded controlling weight, a treating physician's opinion is given weight according to a non-exhaustive list of enumerated factors, including (i) the frequency of examinations and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the physician's opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the physician has a relevant specialty. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); <u>see</u> <u>Clark</u>, 143 F.3d at 118.

Finally, the opinion of a treating physician, or any doctor, that the claimant is "disabled" or "unable to work" is not controlling. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).


IV. DISCUSSION

A. <u>ALJ's Decision</u>

Applying the sequential five-step process for evaluating disability claims, <u>see</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Rosa v. Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999), the ALJ found plaintiff not disabled within the meaning of the Act and thus denied her benefit claims. (R. 17-26) First, the ALJ determined that plaintiff had not engaged in substantial gainful activity since her alleged onset date of April 27, 2006, which was the date of her initial psychiatric evaluation at MHC. (R. 19, 37) This was consistent with the record, as plaintiff testified that she had not worked since December 2004 and that she primarily passes the time by doing things at home. (R. 39, 47)

At the second step of the analysis, the ALJ determined that plaintiff suffered from five "severe" impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c): generalized osteoarthritis, obesity, asthma, anxiety, and panic disorder with agoraphobia. (R. 19)  This finding was supported by plaintiff's medical records.  Dr. Leonid Bukhman diagnosed plaintiff with generalized osteoarthritis on August 23, 2009.  (R. 377)  Dr. Jerome Caiati diagnosed plaintiff with obesity on August 12, 2008.  (R. 281)  Plaintiff was repeatedly diagnosed with asthma at the MHC and by Dr. Bukhman.  (R. 372, 374, 377)  And plaintiff was diagnosed with both anxiety and panic disorder with agoraphobia at the MHC.  (R. 391, 394, 398, 400, 401, 405)  Further, Dr. Haruyo Fujikawi also diagnosed plaintiff with anxiety, and the FEGS examiner also diagnosed panic disorder with agoraphobia.  (R. 285, 342)

Third, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (R. 19)  The ALJ supported this determination with a review of plaintiff's mental impairments according to the framework set forth in 20 CFR § 404.1520a and found that, considered as a whole, plaintiff's impairments do not medically equal or exceed any listed impairments.  (R. 19-20)  Plaintiff's counsel has not contested any of the ALJ's findings made with respect to the first three steps.

Fourth, the ALJ determined that plaintiff, in light of her RFC, was unable to perform any past relevant work—in this case, work as a receptionist.  (R.25)  He based this conclusion on plaintiff's need for limited interpersonal contact and simple low-stress tasks, which he found incompatible with undertaking a position as a receptionist.  Id.

In the final analytical step, the ALJ assessed whether, notwithstanding her severe impairments, plaintiff retained the RFC to perform other work in the national economy.  (R. 20-

17

21, 25-26)  The ALJ concluded that plaintiff has the RFC to perform "light work" as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with limitations of occasional kneeling, crouching, and crawling, and provided that plaintiff must avoid concentrated exposure to respiratory irritants. (R. 20)  He further stated that she could handle "simple low stress, [sic] work with limited interpersonal contact, avoiding hazardous machinery and unprotected heights."  (R. 20-21)  To support his determination, the ALJ extensively reviewed plaintiff's medical records of treatment for both her physical and psychological afflictions.  (R. 20 - 25)  In finding that plaintiff's RFC would allow her to perform other work in the national economy, the ALJ relied on the testimony of the vocational expert.  (R. 26)

As an initial matter, plaintiff does not dispute the ALJ's determination that she is not disabled due to a physical condition.  (Pl.'s Mem. 9-20)  In seeking judgment under Rule 12(c), Fed. R. Civ. P., plaintiff raises three arguments.  Each is addressed below in turn.

## B.  Plaintiff's Objections to the ALJ's Findings

### a.  Weight Afforded to Treating Physicians' Opinions

Plaintiff argues that the ALJ erred by declining to give controlling weight to certain opinions in a single document filled out by one of the treating psychiatrists at MHC. Though the record before the ALJ included over 120 pages of medical records covering four and a half years of treatment at MHC, the sole part of that record that plaintiff argues should control this case is the eight-page Questionnaire filled out by Dr. Aimua on June 10, 2010.  (Pl.'s Mem. 11-13)  As further discussed above, the Questionnaire's language tracks that of SSA regulations governing mental disabilities.  On the Questionnaire, Dr. Aimua indicated that plaintiff had "marked" limitations in the areas of social interaction and adaptation, and that plaintiff was

18

incapable of even a low level of work stress. (R. 362-66)  A "marked" limitation is defined as "more than moderate but less than extreme." (R. 20)  In support of the latter conclusion, Dr. Aimua explained that plaintiff "cannot go out because of her anxiety of getting panic attacks." (R. 366)

The ALJ gave some weight, but not controlling weight, to the Questionnaire, explaining that "the opinions of marked limitations appear to be grossly exaggerated based upon the contradictory objective medical evidence as well as the claimant's contradictory statements." (R. 24)  Considering the entirety of plaintiff's records at MHC, the ALJ noted that they contained many discrepancies, and that there were "no consistent opinions regarding the severity of claimant's psychological condition." Id.  He found notes indicating a history of panic disorder with agoraphobia and occasional anxiety disorder, and that plaintiff had problems being around crowds of people, with occasional panic attacks. Id.  Specifically discussing the Questionnaire, the ALJ found that the opinion suggested therein did not support the limitations noted, "especially since the claimant has stated that she is able to travel by herself to attend her appointments and perform [daily activities] such as shopping." (R. 24)

The ALJ properly determined that Dr. Aimua's opinion was not entitled to controlling weight, and the ALJ's determination is supported by substantial evidence both in his opinion and in the record as a whole.  The opinion of a claimant's treating physician need only be given controlling weight if it is both "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003).

Regardless of whether the findings in Dr. Aimua's Questionnaire are well-supported by medically acceptable techniques, the ALJ properly determined that they are inconsistent with other substantial evidence in the record. As the ALJ stated, the record at MHC is itself internally inconsistent. (R. 24) Reviewing the entire MHC record, the ALJ mentioned plaintiff's treatment at MHC in 2006 and 2007, during which the case was closed on several occasions due to a lack of follow-up and non-compliance. (R.23) Indeed, one treating physician who saw plaintiff consistently from late 2006 through early 2007 encouraged her to find work on at least two instances, and her last appointment during that period indicated a discussion of vocational training. (R. 432-37) (opinion of Dr. Raihana Khorasanee) The ALJ also cited an April 4, 2010 MHC visit, at which plaintiff was reported to be calm, rational, very cooperative, and generally without any abnormal behavior. (R. 394-95) Thus, considered on its own, the treatment record at MHC is ambiguous at best with respect to the severity of plaintiff's impairment.

Further, although plaintiff had been treated at MHC on and off for four years, Dr. Aimua prepared the Questionnaire upon plaintiff's request after having seen plaintiff for the first time three days earlier. (R. 391) As the ALJ noted, the session lasted only twenty minutes. (R. 23, 391) The Questionnaire also inaccurately stated that plaintiff had been treated monthly since April 2006: at the time, she was being seen bi-monthly, and her appointments prior to 2010 were far less frequent. (R. 360) In fact, three days earlier, Dr. Aimua herself scheduled a return visit in two months. (R. 391) These circumstances suggest that the Questionnaire was hastily completed and did not necessarily reflect the whole course of plaintiff's treatment at MHC.

In attempting to rely solely on the Questionnaire without considering the balance of the treating physicians' medical records, plaintiff has misapplied the treating physicians' rule.

SSA regulations state that the purpose of giving more weight to a treating source is that these sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [claimants'] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations. . . ." 20 C.F.R. § 404.1527(c)(2).  The treating source rule does not permit a plaintiff to cherry-pick a single form from an extensive treatment record.  Moreover, at the hearing, the ALJ indicated to plaintiff's counsel that a questionnaire without corresponding consistent treatment records was of little or no evidentiary value.  (R. 35) ("But that's a questionnaire.  Questionnaires without records don't do me any good.")

Even if, as plaintiff urges, Dr. Aimua's lone opinion was deemed to be the unambiguous voice of plaintiff's MHC therapists, the ALJ also expressly relied on the separate contradictory medical opinion of an SSA consulting psychiatrist, Dr. Fujikawi.  "It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence." Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) (citations omitted).  The ALJ reviewed Dr. Fujiwaki's evaluation in detail.  (R. 22)  Dr. Fujiwaki noted that plaintiff could take public transportation, perform simple and complex tasks, and that she "might have some difficulty" maintaining a regular schedule, relating with others, and dealing with stress appropriately.  Id. These findings contradict the conclusions in the Questionnaire relied upon by plaintiff.

Plaintiff argues in the alternative that, even if the ALJ was correct in declining to give controlling weight to Dr. Aimua's opinion, he still failed to properly weigh the treating psychiatrist's findings under the factors set forth in 20 C.F.R. §§ 404.1527(c)(2)-(6) and 416.927(c)(2)-(6) and to provide good reasons for the weight given to the treating specialist.

These factors include length and nature of the treatment relationship, supportability, consistency, and specialization of the treating physician. Id. Although the ALJ did not explicitly recite the factors, his decision nonetheless adequately considered each factor in determining the weight to afford to the Questionnaire. With respect to length and nature of the treatment relationship, the Questionnaire was completed by Dr. Aimua after seeing plaintiff for the first time for a twenty minute appointment. (R. 23)

On the issue of supportability, the applicable regulation provides in part that "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). Dr. Aimua's sole support for her conclusion that plaintiff could not handle even light work-related stress was that plaintiff "cannot go out because of her anxiety of getting panic attacks." (R. 366) As the ALJ noted, this was contradicted both by objective medical evidence (Dr. Fujiwaki's evaluation and other MHC records) and by plaintiff's own testimony, in which she admitted that she could take public transportation alone, as she had done to get to her hearing. (R. 24, 46) Further, the Questionnaire cited no laboratory or diagnostic test results in support of its findings. (R. 361) With respect to the related factor of consistency, the ALJ found the report inconsistent both with the MHC record as a whole and with Dr. Fujiwaki's evaluation. (R. 24-25) Finally, the ALJ noted that the report was prepared by a specialist—namely, a "treating psychiatrist." (R.24)

Plaintiff further asserts that it was error to give more weight to the opinion of Dr. Fujikawi, a one-time consulting examiner, than to the opinion of Dr. Aimua. However, plaintiff's assertion that the ALJ "purported to rely principally" on Dr. Fujiwaki's opinions

mischaracterizes the ALJ's decision.  While it is true that "ALJs should not rely heavily on the findings of consultative physicians after a single examination," Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013), in discrediting the Questionnaire the ALJ considered not only Dr. Fujiwaki's opinion but also the internal inconsistencies in the MHC record as a whole and plaintiff's testimony.  (R. 24)  In any event, particularly in a case such as this one, where the record shows other substantial evidence inconsistent with treating source evidence, a report from a consulting physician may properly be considered as further substantial evidence.  Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983).

Plaintiff's reliance on Burgess v. Astrue, 537 F.3d 117, 132 (2d Cir. 2008) is misplaced.  Contrary to plaintiff's assertion, the Second Circuit has not "[held] that opinions from a consultative examiner who did not review important background medical evidence are "not" considered substantial evidence."  (Pl.'s Mem. 13)  In Burgess, a consultative examiner testified at the administrative hearing without having examined the claimant and without having reviewed a crucial MRI report in the administrative record.  Id. at 125, 132.  In light of these circumstances, the Second Circuit provided guidance for the Commissioner on remand, noting only that the hearing testimony of the examiner was not included in the category of evidence that might substantially contradict the opinion of the claimant's treating doctor.  Id. at 132.  These facts are sharply distinguishable from the instant case, in which Dr. Fujiwaki based his evaluation on an examination of plaintiff.  Plaintiff argues that there is no evidence that her MHC records were made available to Dr. Fujiwaki for review.  This may well be the case, given that plaintiff's counsel was himself unable to provide these records to the ALJ until MHC provided them under subpoena on August 19, 2010, two years after Dr. Fujiwaki's consultation.  (R. 383-85)  In any event, particularly where the consultative physician has directly examined

23

plaintiff, there is no requirement that his opinion be disregarded because of a lack of review of prior records.

Finally, the ALJ also addressed the portion of the February 2, 2009 FEGS record indicating that claimant would be unable to work for twelve months. (R. 24)  This two-page "Treating Physician's Wellness Plan Report" was completed by Dr. Abdul Mohit, an MHC physician who had seen plaintiff for the first time three days earlier. (R. 318, 405)  The ALJ explained that he gave this opinion little weight because it was "conclusory, did not state the claimant's functional limitations and is contradicted by other evidence in the record, including treatment notes and the claimant's own activities." (R. 24)  As discussed above with respect to the Questionnaire, a similar form document completed under similar circumstances, the ALJ adequately expanded upon these rationales in his decision. (R. 21-25)

Whether an individual's impairments amount to a disability under the SSA is for an ALJ to determine.  Where, as here, the ALJ conforms with applicable law and SSA regulations, and the ALJ's decision is supported by substantial evidence, this court will not second-guess his judgment even in cases where there is substantial evidence to the contrary.  See DeChirico v. Callahan, 134 F.3d 1177, 1182 (2d Cir. 1998).

### b.  ALJ's Evaluation of Plaintiff's Credibility

Plaintiff also contends that the ALJ improperly assessed her credibility in determining that plaintiff can perform light work subject to several limitations.  To appropriately evaluate a claimant's allegations concerning the severity of alleged impairments, an ALJ must conduct a two-step inquiry.  First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citing 20 C.F.R. §

24

404.1529(b)).  Second, "[i]f the claimant does suffer from such an impairment. . . the ALJ must

consider the extent to which the claimant's symptoms can reasonably be accepted as consistent

with objective medical evidence and other evidence of record." Id.  (internal quotations omitted)

(citing 20 C.F.R. § 404.1529(a)).  In determining whether a claimant is disabled, an ALJ must

consider subjective evidence of pain or disability to which the claimant testifies, but "may

exercise discretion in weighing the credibility of the claimant's testimony in light of the other

evidence in the record." Genier, 606 F.3d at 49 (citations omitted).

   The ALJ properly recited this standard in his decision and listed plaintiff's alleged

impairments drawn from her hearing testimony.  (R. 21)  After a four-page review of plaintiff's

treatment history and testimony, the ALJ found under the first step that plaintiff's medically

determinable impairments could reasonably be expected to cause the alleged symptoms.  (R. 24)

As to the second part of the test, the ALJ found that "the [plaintiff's] statements concerning the

intensity, persistence and limiting effects of these symptoms are not credible to the extent they

are inconsistent with the above residual functional capacity assessment." Id.

   Plaintiff suggests that this finding improperly evaluated plaintiff's statements

against the ALJ's own RFC determination rather than against the evidence in the record.  But

plaintiff fails to identify any part of the record indicating that the ALJ relied solely—or even

partially—on his own RFC determination to determine plaintiff's credibility.  Instead, plaintiff

cites two cases from the Seventh Circuit criticizing the language in question as "boilerplate" that

implies that the claimant's ability to work was determined first, then used to assess the

claimant's credibility.  See Bjornson v. Astrue, 671 F.3d 640, 644-45 (7th Cir. 2012); Shauger v.

Astrue, 675 F.3d 690, 696 (7th Cir. 2012).  While the language in question may be opaque, the

ALJ did not merely point to the conclusions of his own RFC assessment to support his credibility

determination. Rather, he stated his conclusion after an exhaustive review of plaintiff's medical records and testimony. (R. 21-24)  This passage included a comparison of plaintiff's affirmative statements in her hearing testimony with conclusions reflected in her medical records. (R. 23) Immediately after the language in question, the ALJ further compared plaintiff's testimony against her treatment records at MHC.  In short, far from relying on his own RFC determination, the ALJ's credibility determination was well-supported by a thorough review of plaintiff's medical records and testimony; that this same evidence happens to factor into the ALJ's RFC determination is both unavoidable and irrelevant.

Moreover, the so-called "boilerplate" statement at issue here is accurate.  The ALJ accepted plaintiff's allegations as to her conditions when, at the second step of the five-step disability analysis, he concluded that plaintiff had the severe impairments of generalized osteoarthritis, obesity, asthma, anxiety, and panic disorder with agoraphobia. (R. 19)  He discredited her testimony to the extent that it suggested an inability to work that was not, according to the ALJ's analysis, supported by the balance of medical and testimonial evidence in the record. (R. 21-25)  It is hard to imagine, and plaintiff does not suggest, alternative phrasing that would more clearly indicate the same finding.  Plaintiff thus appears to be objecting to the form of the ALJ's decision rather than its substance.

Plaintiff points to SSR 96-7p (1996 WL 374186) and argues that the ALJ erred in failing to assess plaintiff's credibility under the non-exhaustive list of factors set forth therein. That regulation provides that an ALJ's credibility determination "must" consider (1) plaintiff's daily activities; (2) the location, duration, frequency, and intensity of [her] pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) medications and any side effects; (5) treatment other than medication that the individual has received; (6) measures other

26

than treatment that plaintiff uses to relive pain; and (7) any other relevant factors.  Id.  Once again, plaintiff's objection elevates form over substance: though the ALJ did not recite the list of factors, his analysis nonetheless addressed each of these considerations as well as "other relevant factors."  See R. 20, 23 (discussing plaintiff's daily activities); R. 24 (finding based on review of MHC records that plaintiff's panic attacks are occasional); R. 44 (taking testimony regarding the location, duration, frequency, and intensity of plaintiff's alleged panic attacks); R. 24 (noting plaintiff's claim that her anxiety worsens around other people); Id. (noting that plaintiff testified to taking medications with no side effects, and that plaintiff reported that her medications made her drowsy; also noting plaintiff's psychiatric treatment regimen and that her foot swelling and stiffness worsens after sitting for 45 minutes).

In perhaps the most illustrative "other relevant factor" bearing on plaintiff's credibility, the ALJ took note both at plaintiff's hearing and in his decision of a direct contradiction between plaintiff's testimony and her statements to an evaluator at the Arbor WeCare program made shortly after she lost her job.  (R. 22, 39)  At the August 2005 evaluation, plaintiff stated that she was laid off from her position as a receptionist because "business was slow."  In her evaluation by Dr. Fujiwaki and at her hearing, she attributed her job loss to her lack of ability to concentrate.  (R. 39, 282)  When the ALJ noted the inconsistency with the Arbor WeCare report at the hearing, plaintiff changed her explanation to "both" and "a combination of the two."  (R. 39)  The ALJ took note of this inconsistency in testimony.  (R. 22).

Contrary to plaintiff's assertion, this court has not been asked to "accept post hoc rationalizations by counsel for the Defendant."  (Pl.'s Reply Mem. 2)  Retreating from an earlier argument that the ALJ relied solely on his own RFC assessment, plaintiff concedes that the ALJ based his findings on evidence in her medical records and testimony, but suggests that the ALJ

27

somehow improperly "did not cite [it] as evidence that contradicted Ms. Marquez [sic] allegations." Id. To support this proposition, plaintiff cites Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999), suggesting that this decision forbids counsel for the Commissioner to rely on the totality of the ALJ's decision in preparing a defense. In Snell, the SSA Appeals Council made no reference at all to an examination whose results were more favorable to the claimant than other evidence in the record. Id. On appeal to the Circuit, counsel for the Commissioner offered a rationale for this omission; this rationale, however, was not part of the case record and was not articulated by the Appeals Council in its decision. Id. Thus, the Second Circuit rejected the proffered rationale and stated that a reviewing court "may not accept appellate counsel's post hoc rationales for agency action." Id. In stark contrast to Snell, in this case defendant has identified specific, detailed findings based on evidence in the record that the ALJ explicitly set forth in his issued decision. (See R. 20-25)

In light of substantial evidence in the record supporting the ALJ's credibility determination, the court may not second-guess his decision. This applies with particular force in light of the special deference owed to the credibility determinations of an ALJ who had the opportunity to observe plaintiff's demeanor while testifying. Yellow Freight Sys. Inc. v. Reich, 38 F.3d 76, 81 (2d Cir. 1994).

### c.   Vocational Expert Testimony

Finally, plaintiff argues that the ALJ erred in relying on flawed vocational expert testimony. Plaintiff argues first that the RFC assessment relied upon in the hypothetical was not supported by substantial evidence, and second that the ALJ's hypothetical does not correspond with the mental limitations recognized by the ALJ. As discussed above, the ALJ's RFC was supported by substantial evidence. With respect to the second point, the ALJ recognized that

plaintiff had moderate limitations in the areas of social functioning and concentration, persistence, or pace. (R. 20) In the hypothetical posed to the vocational expert, the ALJ assumed that plaintiff could perform light work subject to numerous limitations, including a limitation to low-stress, simple jobs with limited interpersonal contact. (R. 53)

First, plaintiff, who was represented by counsel at the administrative hearing and whose counsel did take the opportunity to cross examine the vocational expert, raised no objection to the ALJ's hypothetical. (R. 56) Second, although the ALJ did not expressly recite the SSA regulation labels for mental limitations, his hypothetical did take account of the limitations at issue. The limitation to work involving limited interpersonal contact accounted for plaintiff's moderate limitations in social functioning, while the limitation to work that was simple and "low stress" accounted for plaintiff's moderate limitations in concentration, persistence, and pace. While an ALJ's findings must be specific enough to permit meaningful review, this does not imply a requirement that an ALJ expressly parrot the language of 20 CFR § 404.1520a and 416.920a in all cases. As plaintiff concedes, the Second Circuit has not so held, and the cases cited by plaintiff from other Circuits impose no such formal requirement.

An ALJ may rely on vocational experts' testimony that is based on assumptions that are supported by evidence in the record. Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983). Further, "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011) (citing Simila v. Astrue, 573 F.3d 503, 521–22 (7th Cir.2009)); see also Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173–76 (9th Cir.2008); Howard v. Massanari, 255 F.3d 577, 582 (8th

Cir. 2001).  Here, there is ample evidence in the record that, despite plaintiff's limitations, she is able to engage in simple tasks.  (R. 22, 284)

In DeLeon v. Sec'y of Health and Human Servs, 734 F.2d 930, 936 (2d Cir. 1984) the Second Circuit found an ALJ's hypothetical deficient where it failed to make mention of the claimant's shoulder or leg problems, or the "full implications of his epilepsy."  In contrast, here the ALJ specifically accounted for plaintiff's mental impairments by providing hypothetical limitations which took account of plaintiff's social and concentration limitations.

Thus, using the appropriate legal framework, and based on substantial evidence in the record, the ALJ found that plaintiff had not been under a disability, as defined in the Act, during the relevant time period.  (R. 26)

CONCLUSION

For the foregoing reasons, defendant's motion for judgment on the pleadings is GRANTED and plaintiff's motion for judgment on the pleadings is DENIED.  The Clerk is directed to enter judgment for the defendant and close the case.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated:  New York, New York
        October 8, 2013

30